UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------- X

SUSAN TORTORA,

           Plaintiff,

    - against -

SBC COMMUNICAT IONS, INC., SBC,
SBC DISABILITY INCOME PLAN,
AT&T DISABILITY INCOME PLAN,
AT&T INTEGRATED DISABILITY
SERVICE CENTER, SEDGWICK
CLAIMS MANAGEMENT SERVICES,
INC.,

           Defendants.

--------------------------------------------------- X

**OPINION AND ORDER**

**09 Civ. 7895 (SAS)**

> U[...]
> D[...]
> [...]
> E[...]    [...] FILED
> DA[...]   7/30/10

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.  INTRODUCTION

Susan Tortora ("Plaintiff") brings this action against AT&T Inc.

("AT&T") (f/k/a SBC Communications Inc. ("SBC")), AT&T Umbrella Plan No. 1

(of which the AT&T Disability Income Plan (the "Plan"), f/k/a SBC Disability

Income Plan, is a component program), AT&T Integrated Disability Service

Center, and Sedgwick Claims Management Services, Inc. ("Sedgwick")

(collectively, "Defendants") for failure to pay employee disability benefits.  She

alleges that the Plan administrator abused its discretion by not affording her claim

a full and fair review, as required by the Employment Retirement Income Security Act of 1974 ("ERISA"). She also claims the decision to deny her benefits was arbitrary and capricious because it was not supported by substantial evidence. The parties cross-move for summary judgment pursuant to Federal Rule of Civil Procedure 56(b). For the following reasons, Plaintiff's cross-motion for summary judgment is denied and Defendants' motion for summary judgment is granted.

## II.   BACKGROUND[1]

### A.   The Parties

Tortora began working for AT&T – then known as SBC Communications – in 1988.[2] She held a number of positions at various AT&T subsidiaries over the years. Beginning on September 13, 2002, Tortora worked as a Senior Business Manager in the Richardson, Texas office of AT&T Services Inc. ("AT&T Services").[3] During her employment, Tortora was the beneficiary of the AT&T Disability Income Plan (the "Plan") – an ERISA-governed employee

---

[1]    The following facts are drawn from Plaintiff's Statement of Material Facts ("Pl. 56.1"), Defendants' Statement of Material Facts ("Def. 56.1"), Plaintiff's Response to Defendants' Statement of Material Facts ("Pl. Reply 56.1"), Defendants' Response to Plaintiff's Statement of Material Facts ("Def. Reply 56.1"), and the evidence submitted to this Court with respect to these motions.

[2]    See Pl. Reply 56.1 ¶ 1; Def. 56.1 ¶ 1.

[3]    See Pl. Reply 56.1 ¶¶ 2-3; Def. 56.1 ¶¶ 2-3.

2

benefit plan.[4]  AT&T serves as Plan Administrator,[5] and has appointed Sedgwick –

an independent claims management company – as Claims Administrator.[6]

### B.    The Plan

The Plan grants complete discretion to any duly-appointed Claims

Administrator to construe the terms of the Plan and determine claimants' eligibility

for benefits.[7]  Specifically, the Plan provides that the

> Claims Administrator . . . shall have full and exclusive
> authority and discretion to grant and deny claims under the
> Plan, including the power to interpret the Plan and
> determine the eligibility of any individual to participate in
> and receive benefits under the Plan.  The decision of the .
> . . Claims Administrator . . . shall be final and conclusive
> and shall not be subject to further review.[8]

Under the Plan, eligible beneficiaries can receive both Short-Term

---

[4]    In 2001, the SBC Disability Income Plan was merged into the SBC
Umbrella Plan No. 1.  SBC changed its name to AT&T in 2005.  At that time, the
SBC Disability Income Plan became the AT&T Disability Income Plan, and the
SBC Umbrella Plan No. 1 became the AT&T Umbrella Plan No. 1.  *See* Pl. Reply
56.1 ¶¶ 5-8; Def. 56.1 ¶¶ 5-8.

[5]    *See* Pl. Reply 56.1 ¶ 9; Def. 56.1 ¶ 9.

[6]    *See* 6/23/04 Letter from Susan M. Colburn and Karen E. Jennings and
attachments, Ex. E to Certification of Nancy Watts, Senior Benefits Analyst for
AT&T Services ("Watts Cert.").

[7]    *See* Pl. Reply 56.1 ¶ 10; Def. 56.1 ¶ 10.

[8]    Plan Text of the SBC Disability Income Plan ("Plan Text"), Ex. B to
Watts Cert. ¶ 5.5.4 ("Claim Decision-Making Authority").

Disability Benefits ("STD Benefits") and Long-Term Disability Benefits ("LTD Benefits").[9] To qualify for STD Benefits, an employee must have a "Total or Partial Disability,"[10] meaning "that because of Illness or Injury, an Employee is unable to perform all of the essential functions of [her] job or another available job assigned by [AT&T] with the same full-or part-time classification for which the Employee is qualified."[11] Beneficiaries may receive STD Benefits for a maximum of fifty-two weeks, after which they may become eligible for LTD Benefits.[12] With regard to LTD Benefits, "Total Disability" or "Totally Disabled" means "that because of Illness or Injury, an Employee is prevented from engaging in any employment for which the Employee is qualified or may reasonably become qualified based on education, training, or experience."[13] The Plan further states that "[a]n Employee is considered Totally Disabled if he is incapable of performing the requirements of a job other than the one for which the rate of pay is less than 50% of his Basic Wage Rate before his [LTD] started."[14]

---

[9]     *See* Pl. Reply 56.1 ¶ 17; Def. 56.1 ¶ 17.

[10]    Plan Text ¶ 2.23 ("Short Term Disability").

[11]    *Id.* ¶ 2.26 ("Total Disability" or "Totally Disabled").

[12]    *See* Pl. Reply 56.1 ¶¶ 18-19; Def. 56.1 ¶¶ 18-19.

[13]    Plan Text ¶ 2.26.

[14]    *Id.*

4

## C.   Claims Administration

Sedgwick is given sole responsibility for administering claims for both STD and LTD Benefits under the Plan.[15]  Pursuant to its agreement with AT&T, Sedgwick must meet certain performance benchmarks – including claimant satisfaction – or it may be subject to a monetary penalty.[16]  Sedgwick's compensation is not affected by the approval or denial of claims it administers.[17]  The Sedgwick employees charged with making benefit determinations, moreover, do not receive bonuses or incentive pay based on claim outcomes.[18]

Sedgwick refers cases where medical documentation is received but deemed insufficient to support the claim to Network Medical Review Co. Ltd. ("NMR") – a network of independent physician advisors – for consideration. Sedgwick pays NMR for its services, but its compensation is not based on the outcome of claims.[19]  Neither AT&T nor Sedgwick has any control over which physicians are assigned to review submitted claims.[20]  NMR's independent

---

[15]     *See* Pl. Reply 56.1 ¶ 22; Def. 56.1 ¶ 22.

[16]     *See* Pl. Reply 56.1 ¶¶ 23-24; Def. 56.1 ¶¶ 23-24.

[17]     *See* Pl. Reply 56.1 ¶ 26; Def. 56.1 ¶ 26.

[18]     *See* Pl. Reply 56.1 ¶ 27; Def. 56.1 ¶ 27.

[19]     *See* Pl. Reply 56.1 ¶ 31; Def. 56.1 ¶ 31.

[20]     *See* Pl. Reply 56.1 ¶¶ 28-29; Def. 56.1 ¶¶ 28-29.

physician advisors conduct "paper reviews" of the files submitted to them, but do not actually examine the patients to determine their eligibility for benefits.[21]

### D.   Tortora's Benefits Claims

Tortora went on disability leave from her job on August 22, 2005 due to a respiratory infection.[22]  Following the seven-day waiting period, Sedgwick approved Tortora for STD Benefits, which she received from August 29, 2005 to September 22, 2005.[23]  Tortora returned to work on September 26, 2005, but left early the next day and never returned.[24]

On September 30, 2005, Tortora filed a claim for additional STD Benefits on the ground that she was suffering from an upper respiratory infection.[25] Based on the reports of two of Tortora's physicians – Dr. Loehr and Dr. Padegal – Sedgwick questioned whether the medical information supported a finding of total disability, and referred the case to NMR for review.[26]  Dr. Dirnberger, the reviewing physician, concluded that the medical evidence failed to demonstrate

---

[21]    *See* Pl. 56.1 ¶ 80; Def. Reply 56.1 ¶ 80.

[22]    *See* Pl. Reply 56.1 ¶ 35; Def. 56.1 ¶ 35.

[23]    *See* Pl. Reply 56.1 ¶ 36; Def. 56.1 ¶ 36.

[24]    *See* Pl. Reply 56.1 ¶¶ 37-38; Def. 56.1 ¶¶ 37-38.

[25]    *See* Pl. Reply 56.1 ¶ 39; Def. 56.1 ¶ 39.

[26]    *See* Pl. Reply 56.1 ¶¶ 40-43; Def. 56.1 ¶¶ 40-43.

that Tortora was completely incapable of performing her duties.[27]  Accordingly,

Sedgwick denied Tortora's claim for benefits.[28]  Soon thereafter, however, Dr.

Loehr faxed a letter to Sedgwick indicating that Tortora's physical illness had

worsened her psychiatric problems to the point that she was "not ready to enter the

workplace."[29]  Sedgwick then consulted Tortora's psychiatrist Dr. Smith, who

indicated that Tortora's mental state was "profoundly impaired."[30]  Based on this

information, Sedgwick rescinded its previous denial of Tortora's claim, and

approved her for STD benefits through November 13, 2005.[31]

Sedgwick subsequently extended Tortora's benefits two additional

times – first through December 4, 2005, and then again through January 8, 2006.

Sedgwick informed her, however, that she must submit updated medical

information in order to receive additional benefits.[32]  When Tortora and her

---

[27]     Tortora contends, however, that Dr. Dirnberger – a
neuromusculoskeletal physician – was not qualified to review her disability claim
because his specialty was unrelated to her condition. *See* Pl. Reply 56.1 ¶¶ 44-46;
Def. 56.1 ¶¶ 44-46.

[28]     *See* Pl. Reply 56.1 ¶ 47; Def. 56.1 ¶ 47.

[29]     *See* Pl. Reply 56.1 ¶ 49; Def. 56.1 ¶ 49.

[30]     *See* Pl. Reply 56.1 ¶ 51; Def. 56.1 ¶ 51.

[31]     *See* Pl. Reply 56.1 ¶ 52; Def. 56.1 ¶ 52.

[32]     *See* Pl. Reply 56.1 ¶¶ 53-54; Def. 56.1 ¶¶ 53-54.

physicians failed to provide current medical information supporting disability as requested, Sedgwick terminated her STD benefits.[33]  Once again, however, Dr. Loehr belatedly provided updated information regarding Tortora's medical condition.  His report indicated that Tortora had been hospitalized on January 9, 2006 with a persistent low-grade fever, insomnia, moodiness, and depression,[34] and that she was unable to return to work at that time.[35]  Sedgwick extended Tortora's benefits until January 25, 2006.[36]

On January 20, 2006, Sedgwick again consulted Dr. Loehr, who gave a conflicting evaluation of Tortora's progress.  He indicated that Tortora's symptoms were consistent with chronic fatigue syndrome.[37]  Dr. Loehr also stated that although he could not determine when Tortora would be functional again, he was unwilling to indicate that she was permanently disabled.[38]  Although Sedgwick

---

[33]    *See* Pl. Reply 56.1 ¶¶ 55-57; Def. 56.1 ¶¶ 55-57.  Tortora claims Dr. Smith did provide complete and updated mental health information, but this does not establish that the information he provided supported her claim for disability. *See* Pl. Reply 56.1 ¶ 55.

[34]    *See* Pl. Reply 56.1 ¶¶ 58-59; Def. 56.1 ¶¶ 58-59.

[35]    *See* Pl. 56.1 ¶ 20; 1/12/06 Report of Dr. Loehr, Plaintiff's physician, Ex. 2 to Pl. 56.1.

[36]    *See* Pl. Reply 56.1 ¶ 60; Def. 56.1 ¶ 60.

[37]    *See* Pl. 56.1 ¶ 23; Def. Reply 56.1 ¶ 23.

[38]    *See* Pl. Reply 56.1 ¶¶ 61-66; Def. 56.1 ¶¶ 61-66.

tentatively extended Tortora's benefits for a fifth time, the claims administrator referred the claim for medical and psychiatric review.  Dr. Hamilton, the reviewing medical physician advisor, noted in his report that Tortora was suffering from a host of symptoms, including fatigue, retardation of motor activity, and impaired memory, concentration, attention, and focus.  After "[a]n extensive medical workup," however, he determined that she did not suffer from any "specific abnormality."[39]  Because Tortora "would be expected to be able to sit, stand, talk, walk, and type for up to eight hours in an eight-hour workday without restriction," Dr. Hamilton concluded that there was no medical reason to justify extending her benefits.[40]  Dr. Harrop, the psychiatric physician advisor, had a different view.  He found that there were objective indicia to support a diagnosis of "psychiatric incapacity" and that "cognitive deficits . . . would preclude her from appropriate communication with peers and customers and multitasking and higher-level reasoning."[41]  Despite the conflicting reports, Sedgwick extended her benefits through March 12, 2006, and then an additional five times thereafter.[42]

---

[39]     Pl. Reply 56.1 ¶ 71; Def. 56.1 ¶ 71.

[40]     Pl. Reply 56.1 ¶ 72; Def. 56.1 ¶ 72.

[41]     Pl. 56.1 ¶ 27; Pl. Reply 56.1 ¶ 78; Def. 56.1 ¶ 78.

[42]     See Pl. Reply 56.1 ¶¶ 80-85; Def. 56.1 ¶¶ 80-85.

Tortora then underwent a neuropsychological evaluation by Dr. Hargett.  In her report, Dr. Hargett concluded that Tortora "exhibited generally mild cognitive deficits," but noted that her "level of impairment . . . did not reprsent a significant decline in overall intellectual functioning" and questioned whether she was exaggerating her symptoms.[43]  Dr. Hargett suggested that Tortora's emotional state might be improved by returning to work, but noted that she might also benefit from switching careers altogether.[44]

Sedgwick extended Tortora's benefits for a twelfth time, but referred the neuropsychological evaluation to NMR for review.  Upon reading Dr. Hargett's report, as well as Dr. Loehr's, the reviewing physician found that Tortora's psychiatric condition did not support any restrictions or limitations on her work, or a finding of disability.[45]  Accordingly, Sedgwick definitively discontinued Tortora's STD benefits as of June 16, 2006.[46]

---

[43]     Pl. Reply 56.1 ¶¶ 91-92; Def. 56.1 ¶¶ 91-92.

[44]     See Pl. Reply 56.1 ¶ 94; Def. 56.1 ¶ 94.

[45]     See Pl. Reply 56.1 ¶ 97; Def. 56.1 ¶ 97.

[46]     Originally, the effective date of denial was June 7, 2006, but Sedgwick eventually changed it to June 16.  See Pl. Reply 56.1 ¶¶ 101-102; Def. 56.1 ¶¶ 101-102.

### E.    Tortora's Appeal

Tortora appealed Sedgwick's finding that she was ineligible for additional STD benefits.  In support of her appeal, Tortora submitted reports from five physicians detailing her medical condition.[47]  One of these physicians – Dr. Vine – diagnosed her with fibromyalgia.[48]  Drs. Smith and Loehr, however, both wrote letters asserting that Tortora's depression and bipolar disorder were largely under control, and that she was no longer psychiatrically disabled.[49]  Sedgwick, in turn, forwarded Tortora's file to five different independent physician specialists for review.  All five concluded that Tortora was not disabled, and that she could return to her job without a problem.[50]  Dr. Shallcross – the reviewing psychologist – noted that there was little objective evidence to support claims of severe psychiatric impairment.  He also highlighted the inconsistencies among the various treating physicians' reports.[51]  Accordingly, Sedgwick upheld its prior decision to

---

[47]    *See* Pl. Reply 56.1 ¶ 111; Def. 56.1 ¶ 111.

[48]    *See* Pl. Reply 56.1 ¶ 112; Def. 56.1 ¶ 112.

[49]    *See* Pl. Reply 56.1 ¶ 113; Def. 56.1 ¶ 113.

[50]    *See* Pl. Reply 56.1 ¶¶ 116-133; Def. 56.1 ¶¶ 116-133.

[51]    *See* Pl. Reply 56.1 ¶ 132; Def. 56.1 ¶ 132 ("The origin of [Plaintiff's] primarily self-reported impairments is deemed to be physical by the psychiatrist and psychological by Dr. Loehr.  The neuropsychologist affirms that the deficits are primarily psychological as opposed to neurocognitive and the psychiatrist states that the claimant's depression and bipolar symptoms have remitted to a

11

deny her claim for additional STD benefits.[52]

## III.   STANDARD OF REVIEW AND APPLICABLE LAW

### A.   Summary Judgment

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[53]  "'An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the non[-]moving party.  A fact is material if it might affect the outcome of the suit under the governing law.'"[54]  "[T]he burden of demonstrating that no material fact exists lies with the moving party . . . ."[55]  "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact

---

significant degree.").

[52]     *See* Pl. Reply 56.1 ¶ 134; Def. 56.1 ¶ 134.  Because Tortora received less than fifty-two weeks of STD Benefits, she was deemed ineligible for LTD Benefits under the Plan.  Tortora also appealed that determination, but her appeal was denied.  *See* Pl. Reply 56.1 ¶ 139; Def. 56.1 ¶ 139.

[53]     Fed. R. Civ. P. 56(c).

[54]     *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009) (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 34 (2d Cir. 2008)).

[55]     *Miner v. Clinton County, N.Y.*, 541 F.3d 464, 471 (2d Cir. 2008) (citing *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007)).

12

on an essential element of the non[-]movant's claim."[56]

To defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact.[57]  The non-moving party must do more than show that there is "'some metaphysical doubt as to the material facts,'"[58] and it "'may not rely on conclusory allegations or unsubstantiated speculation.'"[59] However, "'all that is required [from a non-moving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.'"[60]

In determining whether a genuine issue of material fact exists, the court must "constru[e] the evidence in the light most favorable to the non-moving

---

[56]     *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).

[57]     *See id.*

[58]     *Higazy v. Templeton*, 505 F.3d 161, 169 (2d Cir. 2007) (quoting *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

[59]     *Jeffreys v. City of N.Y.*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001)). *Accord* Fed. R. Civ. P. 56(e) ("When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.").

[60]     *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 206 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986)).

party and draw all reasonable inferences" in that party's favor.[61]  However, "'only

admissible evidence need be considered by the trial court in ruling on a motion for

summary judgment.'"[62]  "'Credibility assessments, choices between conflicting

versions of the events, and the weighing of evidence are matters for the jury, not

for the court on a motion for summary judgment.'"[63]  Summary judgment is

therefore "appropriate only if there is no genuine issue of material fact and the

moving party is entitled to judgment as a matter of law."[64]

### B.   ERISA Standard

Pursuant to section 502(a)(1)(B) of ERISA, a plan participant or

beneficiary may bring a civil action "to recover benefits due to [her] under the

terms of his plan."[65]  In *Firestone Tire & Rubber Co. v. Bruch*, the Supreme Court

held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed

under a de novo standard unless the benefit plan gives the administrator or

---

[61]   *Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009) (citing *Anderson*, 477 U.S. at 247-50, 255).

[62]   *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009) (quoting *Raskin v. Wyatt Co.*, 125 F.3d 55, 65 (2d Cir. 1997)).

[63]   *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997)).

[64]   *Pyke v. Cuomo*, 567 F.3d 74, 76 (2d Cir. 2009).

[65]   29 U.S.C. § 1132(a)(1)(B).

14

fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."[66] The Second Circuit has repeatedly held that when an ERISA-governed employee benefits plan grants the plan administrator authority to determine claimants' eligibility for benefits, "the standard governing the district court's review . . . is the arbitrary-and-capricious standard."[67] "Under the deferential standard, a court may not overturn the administrator's denial of benefits unless its actions are found to be arbitrary and capricious, meaning 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'"[68] "'Where both the plan administrator and a spurned claimant offer rational, though conflicting, interpretations of plan provisions, the administrator's interpretation

---

[66]     489 U.S. 101, 115 (1989).

[67]     *Pepe v. Newspaper & Mail Deliveries'-Publishers' Pension Fund*, 559 F.3d 140, 146 (2d Cir. 2009) (citing *Firestone*, 489 U.S. at 115). *Accord Durakovic v. Building Serv. 32 BJ Pension Fund*, 609 F.3d 133, 138 n.2 (2d Cir. 2010) ("In an action under 29 U.S.C. § 1132(a)(1)(B), the district court conducts arbitrary-and-capricious review of ERISA-fund administrators' discretionary decisions." (citations omitted)). *See also Hobson v. Metropolitan Life Ins. Co.*, 574 F.3d 75, 82 (2d Cir. 2009); *Giordano v. Thomson*, 564 F.3d 163, 168 (2d Cir. 2009).

[68]     *McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 133 (2d Cir. 2008) (quoting *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 441 (2d Cir. 1995)). The Second Circuit has held that "substantial evidence" means "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (quoting *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004)).

15

must be allowed to control.'"[69]  However, "'where the administrator imposes a standard not required by the plan's provisions, or interprets the plan in a manner inconsistent with its plain words, its actions may well be found to be arbitrary and capricious.'"[70]

## 1. Conflict of Interest

The deferential *Firestone* standard remains largely unchanged, even when a plan administrator faces a conflict of interest.  Under the Supreme Court's recent decision in *Metropolitan Life Insurance Co. v. Glenn*,[71] "'a plan under which an administrator both evaluates and pays benefits claims creates the kind of conflict of interest that courts must take into account and weigh as a factor in determining whether there was an abuse of discretion, but does not make de novo review appropriate.'"[72]  "A plaintiff's showing that the administrator's conflict of interest affected the choice of a reasonable interpretation is only one of 'several different considerations' that judges must take into account when 'review[ing] the

---

[69]     *McCauley*, 551 F.3d at 132 (quoting *Pulvers v. First UNUM Life Ins. Co.,* 210 F.3d 89, 92 (2d Cir. 2000)) (internal quotation marks and citations omitted).

[70]     *Pepe*, 559 F.3d at 147 (quoting *McCauley*, 551 F.3d at 133).

[71]     — U.S. —, 128 S. Ct. 2343 (2008).

[72]     *Hobson,* 574 F.3d at 82-83 (quoting *McCauley*, 551 F.3d at 133).

lawfulness of benefit denials.'"[73]  Consideration of the conflict is given greater or lesser consideration depending on whether the "'the administrator has taken active steps to reduce potential bias and to promote accuracy.'"[74]

### 2.   Breach of Fiduciary Duty

"[W]here a plan participant has no remedy under another section of ERISA, she can assert a claim for breach of fiduciary duty under § 502(a)(3)."[75] Section 502(a)(3) provides that "plan participants, beneficiaries or fiduciaries [may] bring a civil action 'to enjoin any act or practice which violates any provision of this subchapter or terms of the plan, or . . . obtain other appropriate equitable relief.'"[76]  This provision, therefore, "act[s] as a safety net, offering appropriate equitable relief for injuries caused by [ERISA] violations that § 502 does not elsewhere adequately remedy."[77]

In *Varity Corp. v. Howe*, the Supreme Court held that equitable relief

---

[73]   *Id.* (quoting *McCauley*, 551 F.3d at 133).  *Accord Glenn*, 128 S. Ct. at 2351 ("*Firestone* means what the word 'factor' implies, namely, that when judges review the lawfulness of benefit denials, they will often take account of several different considerations of which a conflict of interest is one.").

[74]   *Burgess*, 537 F.3d at 127 (quoting *Glenn*, 128 S. Ct. at 2348).

[75]   *Devlin v. Empire Blue Cross & Blue Shield*, 274 F.3d 76, 89 (2d Cir. 2001) (citing *Varity Corp. v. Howe*, 516 U.S. 489, 515 (1996)).

[76]   *Id.* (quoting 29 U.S.C. § 1132(a)(3)).

[77]   *Varity Corp.*, 516 U.S. at 512.

under section 502(a)(3) will ordinarily not be necessary where the beneficiary can obtain relief for her injury under other provisions of the statute.[78]  As the Second Circuit subsequently explained, however, "*Varity Corp.* did not eliminate a private cause of action for breach of fiduciary duty when another potential remedy is available."[79]  While "the [*Varity Corp.*] Court indicated that equitable relief under § 502(a)(3) would 'normally' not be appropriate" under such circumstances, it *could* be granted at the court's discretion.[80]  Should the plaintiff succeed on both her section 502(a)(1)(B) claim, to enforce the terms of a plan, and her claim for breach of fiduciary duty under section 502(a)(3), "the determination of 'appropriate equitable relief' rests with the district court."[81]  "This determination must be based on ERISA policy and the 'special nature and purpose of employee benefit plans.'"[82]

---

[78]    *See id.* at 515 ("[W]e should expect that where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be appropriate.") (internal citations and quotation marks omitted).

[79]    *Devlin*, 274 F.3d at 89.

[80]    *Id.*

[81]    *Id.*

[82]    *Id.* (quoting *Varity Corp.*, 516 U.S. at 515).

### 3.     Full and Fair Review

Section 503(1) of ERISA requires than an employee benefits plan "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant,"[83] and "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review."[84]  "Additionally, ERISA regulations . . . require that notice to the claimant of an adverse benefit determination 'shall set forth, in a manner calculated to be understood by the claimant . . . [a] description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action.'"[85]  "[T]he purpose of ERISA's notice requirement is to 'provide claimants with enough information to prepare adequately for further administrative review or an appeal to the federal courts.'"[86]

---

[83]     29 U.S.C. § 1133(1).

[84]     Id. § 1133(2).

[85]     *Strom v. Siegel Fenchel & Peddy P.C. Profit Sharing Plan*, 497 F.3d 234, 245 (2d Cir. 2007) (quoting 29 C.F.R. § 2560.503-1(g)(1)).

[86]     *Hobson*, 574 F.3d at 87 (quoting *Juliano v. Health Maint. Org. of NJ*, 221 F.3d 279, 287 (2d Cir. 2000)).

19

## IV. DISCUSSION

### A.    Standard of Review

Tortora claims that this Court should apply a "heightened standard" of review because the mutually advantageous arrangement between AT&T and Sedgwick biased the claims process against her.[87]  In so arguing, however, Tortora misconstrues the central holding of *Glenn*.  The Court in *Glenn* made clear that a plan administrator's discretionary denial of benefits must be reviewed under a deferential standard, even when that plan administrator has a conflict of interest.[88] A reviewing court need only "consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits."[89] Because Tortora does not contest that Sedgwick is given discretion to determine eligibility for benefits under the Plan, a heightened standard of review is inappropriate.[90]

---

[87]    *See* Plaintiff's Memorandum of Law in Support of Cross-Motion for Summary Judgment ("Pl. Mem.") at 14-15.

[88]    *See Glenn*, 128 S. Ct. at 2350 ("We do not believe that *Firestone*'s statement implies a change in the standard of review, say, from deferential to de novo review.").

[89]    *Id.* at 2346.

[90]    *See Hobson*, 574 F.3d at 83 (holding that de novo review of the decision to deny benefits was unwarranted, notwithstanding a "structural conflict of interest" on the part of the plan administrator that "affected the choice of a

**B.     Conflict of Interest**

Contrary to Tortora's claims, it is not entirely clear that a conflict of interest in fact exists here.  In *Firestone*, the employer acted as plan administrator, and was therefore responsible for both evaluating claims and paying benefits.[91] Such an arrangement clearly creates a conflict of interest, because "'every dollar provided in benefits is a dollar spent by . . . the employer; and every dollar saved . . . is a dollar in [the employer's] pocket.'"[92]  Accordingly, "[t]he employer's fiduciary interest may counsel in favor of granting a borderline claim while its immediate financial interest counsels to the contrary."[93]  Similarly, *Glenn* involved an insurance company that both evaluated claims for benefits and paid benefits claims in its capacity as administrator of Sears, Roebuck, & Company's long-term disability insurance plan.[94]  In both cases, the Court determined the administrator "ha[d] an 'interest . . . conflicting with that of the beneficiaries,' the type of conflict that judges must take into account when they review the discretionary acts

---

reasonable interpretation").

[91]     489 U.S. at 105.

[92]     *Glenn*, 128 S. Ct. at 2348 (quoting *Bruch v. Firestone Tire & Rubber Co.*, 828 F.2d 134, 144 (3d Cir. 1987)).

[93]     *Id.*

[94]     *See id.*

21

of a trustee of a common-law trust."[95]  By contrast, Sedgwick – the company

charged with determining eligibility for benefits under the Plan – is structurally

independent of AT&T, which ultimately funds the Plan and pays benefits claims.

Unlike a plan administrator that "both determines whether an employee is eligible

for  benefits and pays benefits out of its own pocket"[96] – such as the employer-

administrator in *Firestone* or the insurance company-administrator in *Glenn* –

Sedgwick does not have to pay out benefits, and therefore has little financial

incentive to falsely deny claims.[97]  If anything, Sedgwick has an incentive to

provide accurate claims processing, because its professional reputation depends on

unbiased results and customer satisfaction.[98]

Tortora claims that Sedgwick is "keenly interested in saving AT&T

money in disability payouts" because AT&T comprises a large part of Sedgwick's

---

[95]     *Id.*

[96]     *Id.* at 2346.

[97]     *Cf. id.* at 2349 (nohing that a structural conflict "is less clear where . .
. the plan administrator is not the employer itself but rather a professional
insurance company," because such a company "has a much greater incentive than a
self-insuring employer to provide accurate claims processing.").

[98]     As noted above, AT&T evaluated Sedgwick's performance based in
part on claimant satisfaction surveys.

22

business, and Sedgwick has an interest in retaining AT&T's business.[99] It is of

course possible that Sedgwick – a company on AT&T's payroll – was influenced

vicariously by AT&T's financial interest in denying claims,[100] but that would be

the case whenever an employer hires a third party claims administrator. An

employer has no choice but to administer the plan itself, as in *Firestone*, enlist a

third party insurance company to both evaluate claims and pay benefits, as in

*Glenn*, or split the functions between two entities, as in the present case. By

Plaintiff's logic, there could be no means of administering an ERISA benefits plan

without creating a conflict of interest. *Glenn* does not demand such a result.[101]

---

[99]     Plaintiff's Reply to Defendants' Cross Motion for Summary Judgment ("Pl. Reply Mem.") at 1-2.

[100]     *See Glenn*, 128 S. Ct. at 2349-50 (noting that "the employer's own conflict may extend to its selection of an insurance company to administer its plan").

[101]     As the Second Circuit recently explained, "[t]he initial inquiry [in the *Glenn* analysis] is simple: whether the 'plan administrator both evaluates claims for benefits and pays benefits claims.'" *Durakovic*, 609 F.3d at 138 (quoting *Glenn*, 128 S. Ct. at 2348). Tortora's reliance on *Durakovic* is misplaced because the plan at issue there – an ERISA fund organized as a trust – is structurally similar to the plans in *Firestone* and *Glenn*, where the administrator's evaluator-payor dual role created a "categorical conflict," but distinguishable from the AT&T Plan. The *Durakovic* court noted that "as in *Glenn*, the evaluation of claims [in an ERISA trust] is entrusted (at least in part) to representatives of the entities that ultimately pay the claims allowed." *Id.* at 139. As noted above, Sedgwick is not involved in the payment of claims, and therefore does not have a comparable conflict of interest.

Tortora also contends that Sedgwick's repeated use of NMR physician reviewers evidences a conflict of interest.  Relying on dicta from *Black & Decker Disability Plan v. Nord*, she argues that "physicians repeatedly retained by benefits plans may have an incentive to make a finding of 'not disabled' in order to save their employers money and to preserve their own consulting arrangements."[102] While this is undoubtedly so, Tortora fails to read the remainder of the Court's opinion.  Indeed, the very next sentence contradicts her argument.  "But the assumption that the opinions of a treating physician warrant greater credit than the opinions of plan consultants may make scant sense when, for example, the relationship between the claimant and the treating physician has been of short duration, or when a specialist engaged by the plan has expertise the treating physician lacks."[103]   More to the point, the Court goes on to say, "if a consultant engaged by a plan may have an 'incentive' to make a finding of 'not disabled,' so a treating physician, in a close case, may favor a finding of 'disabled.'"[104]  There is no basis for assuming that the disability determination was biased by the use of

---

[102]     538 U.S. 822, 832 (2003) (internal quotation marks and citations omitted).

[103]     *Id.*

[104]     *Id.*

24

NMR's independent physician advisors.[105]  In fact, reliance on outside medical

consultants would seem to improve the claims process.[106]  I cannot find, therefore,

the existence of a *Glenn* conflict.[107]

Even assuming, *argumendo*, that a conflict of interest exists for

ERISA purposes, that does not end the inquiry.  On the contrary, this Court must

weigh the conflict as a factor in determining whether there was an abuse of

---

[105]      In support of her contentions, Tortora cites other court cases in which
Dr. Goldman and Dr. Mody – two NMR reviewing physicians – issued opinions
regarding claimants' disability.  She notes that in every case, these doctors
determined that the claimant in question was capable of returning to work.  On that
basis, she concludes that these doctors "were loath to find any disability when
reviewing [claimants'] ERISA claim[s]."  Plaintiff's Reply Mem. at 7-8.  As
Defendants point out, however, these statistics cannot prove bias on the part of
NMR reviewers.  Litigation only arises when physicians find that claimants are not
disabled, and benefits are denied accordingly; "if the claimants were found eligible
for disability benefits, there would be no litigation."  Reply Brief in Support of
Defendants' Motion for Summary Judgment at 4.

[106]      One of the cases cited by Tortora herself supports this contention.  *See*
*Kludka v. Qwest Disability Plan*, No. 08 Civ. 1806, 2010 WL 1408895, at *6 (D.
Ariz. Apr. 7, 2010) ("Plan administrators should consult and rely on medical
experts when making disability determinations.  To make such decisions without
the close assistance of medical professionals might well produce inaccurate and
unfounded claim denials.  The fact that doctors are retained and relied on heavily
for such a medical decision is entirely reasonable and foreseeable.").

[107]      *See* Pl. Reply Mem. at 4.  Tortora also suggests that Sedgwick's use of
Disability Duration Guidelines – a best practices guide for claims reviewers –
demonstrates bias in favor of denying claims.  I find no evidence to suggest that
the mere existence of such guidelines biases the claims process, or that Sedgwick
unreasonably relied on the guide to the exclusion of pertinent medical evidence.

25

discretion on the part of the administrator. The "significance of the factor," however, "depend[s] upon the circumstances of the particular case."[108] "The weight properly accorded a *Glenn* conflict varies in direct proportion to the 'likelihood that [the conflict] affected the benefits decision.'"[109] "Evidence that a conflict affected a decision may be categorical (such as 'a history of biased claims administration') or case specific (such as an administrator's deceptive or unreasonable conduct), and may have bearing also on whether a particular decision is arbitrary and capricious."[110]

Where, as here, the administrator "has taken active steps to reduce potential bias and to promote accuracy," the conflict of interest "should prove less important (perhaps to the vanishing point)."[111] AT&T is completely walled off from Sedgwick. AT&T has no role in deciding which claimants are eligible for benefits, and Sedgwick's compensation is completely independent of its claim denial rate. Moreover, the performance benchmarks contained in Sedgwick's

---

[108]   *Glenn*, 128 S. Ct. at 2346.

[109]   *Durakovic*, 609 F.3d at 139 (quoting *Glenn*, 128 S. Ct. at 2351).

[110]   *Id.* (quoting *Glenn*, 128 S. Ct. at 2351).

[111]   *Glenn*, 128 S. Ct. at 2351 (steps that tend to diminish the significance of a *Glenn* conflict include "walling off claims administrators from those interested in firm finances" and "imposing management checks that penalize inaccurate decision[-]making irrespective of whom the inaccuracy benefits").

contract with AT&T reduce the incentive to inaccurately deny claims. Sedgwick's policy of referring claims to NMR only further protects against bias, because it adds an additional layer of independent review.

There is no evidence to suggest that Sedgwick has a history of unreasonably denying claims. Of the nearly 58,700 claims for Plan benefits handled by Sedgwick between 2003 and 2006, less than 4,600 were appealed.[112] Of these, 1,300 (less than one-third) were overturned on appeal.[113] This is hardly an indication that Sedgwick refused to grant meritorious claims. Nor does Tortora offer any proof that either Sedgwick or NMR were biased by their economic relationship with each other or with AT&T. In fact, Plan referrals represented only a small fraction of NMR's total business during the relevant time period – as little as 1.2 percent in 2003, and at most seven percent in 2006.[114] Sedgwick, moreover, is one of the largest claims services providers in the country, with revenues exceeding five hundred million dollars in 2006. That the company handled fifteen

---

[112]    *See* 4/30/10 Letter from Kristine J. Feher, Counsel for Defendants ("Feher Letter") at 1-2.

[113]    *See id.* at 3. The data submitted by Sedgwick represents only those disability claim appeals that were referred to NMR physician advisors. The total number of benefits denials overturned on appeal is likely higher than 1,300.

[114]    *See id.* at 4.

thousand claims per year from AT&T proves little,[115] especially in light of the fact

that disability claims on the whole make up less than twenty percent of Sedgwick's

business (and AT&T-related claims undoubtedly less).[116] Even if Sedgwick does

employ an entire team just to deal with claims for benefits under the Plan, there is

simply no support for the proposition that Sedgwick is the "alter ego" of AT&T.[117]

While Sedgwick ultimately dismissed the findings of some of Tortora's physicians,

it was not the case that review of her disability claim was completely "one-sided,"

as in *Durakovic*.[118] Contrary to Tortora's assertion, the fact that none of the NMR

physician advisors examined her does not imply that the claims decision was

biased.[119] Accordingly, the conflict of interest – if there is one – deserves little or

---

[115]    *See id.* at 1.

[116]    *See* Sedgwick 2006-07 Report & Outlook at 3-4,
https://www.sedgwickcms.com/docs/Outlook/OutlookReport06-07.pdf.

[117]    Pl. Reply Mem. at 1.

[118]    *Durakovic*, 609 F.3d at 140.

[119]    *See Hobson*, 574 F.3d at 91 (holding that a Plan administrator's
failure to conduct an independent medical examination does not render a benefits
denial arbitrary and capricious). See *also Fitzpatrick v. Bayer Corp.*, No. 04 Civ.
5134, 2008 WL 169318, at *14 (S.D.N.Y. Jan. 17, 2008) ("any suggestion that an
administrator's physicians are required to conduct an in-person, physical
examination of a plaintiff rather than a review of the record in a case such as this is
unsupported by law") (citations omitted).

28

no weight in this Court's arbitrary-and-capricious review.[120]

## C.    Sedgwick's Denial of Tortora's Benefits Was Neither Arbitrary Nor Capricious

Tortora contends that Sedgwick's decision to deny her benefits was "arbitrary and capricious" because it was not supported by reason or substantial evidence.  Tortora also contends that Sedgwick abused its discretion by not affording her claim a "full and fair review" as required by section 503(2) of ERISA.  Specifically, Tortora alleges that Sedgwick failed to fully and fairly review her claim by, *inter alia*, (1) not notifying her of what additional information or evidence she needed to satisfy deficiencies in the claim; (2) giving undue weight to the opinions of Sedgwick's consultants over those of Tortora's treating physicians; (3) requiring objective support for her medical conditions; and (4) failing to consider all the medical evidence she submitted.

### 1.    ERISA Notice Requirement

Sedgwick clearly communicated to Tortora the reason her STD Benefits were being terminated, as required by section 503(1) of ERISA.[121]  In a

---

[120]    *See Durakovic*, 609 F.3d at 140 ("No weight is given to a conflict in the absence of any evidence that the conflict actually affected the administrator's decision.") (citing *Hobson*, 574 F.3d at 83).

[121]    *See* 29 U.S.C. § 1133(1) (a plan administrator must provide the claimant with "adequate notice in writing . . . setting forth the specific reasons for

letter dated June 22, 2006, Sedgwick explains that its decision to deny benefits was based on a review of medical documentation provided by Dr. Loehr, as well as the neuropsychological evaluation performed by Dr. Hargett.[122]  Dr. Hargett's evaluation indicated that Tortora manifested "mild cognitive deficits," and that she should continue taking psychoactive medications, but that "[h]er emotional state may also improve by returning to work."[123]  The letter stated that AT&T had given Tortora the opportunity to return to work gradually, with accomodations for her mental condition, but she declined.[124]  Accordingly, Sedgwick concluded that Tortora's claim did not qualify for payment under Article II, paragraph 2.26 of the Plan because she was not "Totally Disabled".  The letter then notified Tortora that she was entitled to make a written appeal with 180 days, directed her to a copy of the appeal procedure and appeal form, which it enclosed with the letter, and ordered her to submit any additional evidence she wished to have reviewed in connection with the appeal.  The letter also notified Tortora of her right to bring a

_____

[a claim] denial, written in a manner calculated to be understood by the participant").

[122]    *See* 6/22/06 Sedgwick Claim Denial Letter, Ex. F to Certification of Susan HagEstad, Appeals Manager for Sedgwick.

[123]    *Id.*

[124]    *See id.*

30

lawsuit under section 502(a) of ERISA.

Although Sedgwick's benefits denial letter did not identify specific information Tortora could offer to cure the defects in her claim, Sedgwick did extend Tortora's STD Benefits twelve times over the course of nine months.  This implies that Sedgwick evaluated all aspects of Tortora's claim, and considered relevant medical information that supported her claim for disability.[125]  The fact that Tortora was able to "perfect her claim" twelve times – up until the point Sedgwick ultimately decided she was not disabled – indicates "that she was fairly apprised of how she could 'prepare adequately' for subsequent appeals of earlier benefit denials."[126]  Accordingly, I find that Sedgwick complied with the ERISA notice requirement.

### 2.  Weight of Competing Medical Evaluations

Tortora takes issue with the fact that Sedgwick disregarded the diagnoses of her treating physicians, and chose instead to rely on the opinions of NMR physician advisors who were not specialists on her condition.  The Supreme Court in *Nord* explained that "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician;

---

[125]   *See Hobson*, 574 F.3d at 87-88.

[126]   *Id.* at 88 (quoting *Juliano*, 221 F.3d at 287).

nor may courts impose on plan administrators a discrete burden of explanation

when they credit reliable evidence that conflicts with a treating physician's

evaluation."[127]  In other words, "while the administrator may choose to give greater

weight to the treating physician's findings, it is not required to do so under the

arbitrary and capricious standard."[128]  As the Second Circuit has made clear,

administrators may consider the opinions of paid medical consultants when making

benefits decisions.[129]  Sedgwick's failure to defer to the assessments of Tortora's

treating physicians, therefore, was not arbitrary and capricious.

### 3.    Requirement of Objective Medical Evidence

Tortora also contends that Sedgwick's continued requests for

additional medical evidence to support her disability claim were unreasonable, and

that discontinuing her benefits on the basis that she failed to provide such evidence

was arbitrary and capricious.  The Second Circuit in *Hobson*, however, held that it

---

[127]    538 U.S. at 834. *Accord Hobson*, 574 F.3d at 85.

[128]    *Fitzpatrick*, 2008 WL 169318, at *13 (citing *Nord*, 538 U.S. at 823-
24). *Accord Hobson*, 574 F.3d at 90 (the plan administrator "is not required to
accord the opinions of a claimant's treating physicians 'special weight,' especially
in light of contrary independent physician reports") (quoting *Nord*, 538 U.S. at
834).

[129]    *See Hobson*, 574 F.3d at 90 (holding that the plan administrator "did
not abuse its discretion by considering these trained [independent reviewing]
physicians' opinions solely because they were selected, and presumably
compensated, by [the administrator]").

is not unreasonable or arbitrary for plan administrators to require the plaintiff to

produce objective evidence of disability "in order to guard against fraudulent or

unsupported claims of disability."[130]  As in *Maniatty v. Unumprovident Corp.*,

Sedgwick did not ignore the reports of Tortora's treating physicians, but instead

"relied on the fact that none of them adduced any objective evidence of plaintiff's

complaints."[131]  While an administrator may not arbitrarily disregard evidence

submitted by a claimant's physician,[132] Sedgwick was not required to accept

Tortora's subjective complaints in the absence of objective evidence supporting

disability.[133]

      In response, Tortora claims that she was suffering from, *inter alia*,

fibromyalgia, chronic fatigue, and trouble concentrating – all of which are

---

[130]    *Hobson*, 574 F.3d at 89.  *Accord Diamond v. Reliance Standard Life Ins.*, 672 F. Supp. 2d 530, 537 (S.D.N.Y. 2009) (noting that "courts in this district have found that an administrator's reliance on the opinions of non-examining physicians over the plaintiff's own treating physicians is not, in and of itself, arbitrary and capricious") (citations omitted).

[131]    218 F. Supp. 2d 500, 504 (S.D.N.Y. 2002), *aff'd*, 62 Fed. Appx. 413 (2d Cir. 2003).

[132]    *See Nord*, 538 U.S. at 834.

[133]    *See Maniatty*, 218 F. Supp. 2d at 504 ("In these circumstances, it was not unreasonable for the administrator to conclude that the only material reason the treating physicians were reaching their diagnoses was based on their acceptance of plaintiff's subjective complaints: an acceptance more or less required of treating physicians, but by no means required of the administrator.").

characterized by subjective symptoms, and do not lend themselves to objective

medical findings.  Relying on *Strope v. Unum Provident Corp.*, she argues that it

was therefore unreasonable for Sedgwick to require clinical evidence in support of

her disability claim.[134]  As the court in *Strope* notes, however, "'[a] distinction

exists . . . between the amount of fatigue or pain an individual experiences, which  .

. . is entirely subjective, and how much an individual's degree of pain or fatigue

limits his functional capabilities, which can be objectively measured.'"[135]  The

Second Circuit has explicitly held that plan administrators may require objective

evidence of disability, even when the claimant is suffering from diseases like

---

[134]    No. 06 Civ. 628C, 2010 WL 1257917, at *6-*7 (W.D.N.Y. Mar. 25, 2010).  *See also Diamond*, 672 F. Supp. 2d at 536 ("While the very concept of proof connotes objectivity and it is hardly unreasonable for the administrator to require an objective component of such proof, the subjective element of pain is an important factor to be considered in determining disability.  Diseases such as chronic fatigue syndrome and fibromyalgia pose unique issues for insurance plan administrators, since for these types of conditions, their cause or causes are unknown, there is no cure, and, of greatest importance to disability law, their symptoms are entirely subjective.") (internal quotation marks and citations omitted).

[135]    *Strope*, 2010 WL 1257917, at *6 (quoting *Williams v. Aetna Life Ins. Co.*, 509 F.3d 317, 323 (7th Cir. 2007)).  *Accord Boardman v. Prudential Ins. Co. of Am.*, 337 F.3d 9, 16 n.5 (1st Cir. 2003) ("While the diagnoses of chronic fatigue syndrome and fibromyalgia may not lend themselves to objective clinical findings, the physical limitations imposed by the symptoms of such illnesses do lend themselves to objective analysis."); *Cook v. N.Y. Times Co. Long-Term Disability Plan*, No. 02 Civ. 9154, 2004 WL 203111, at *4 (S.D.N.Y. Jan. 30, 2004) ("It is . . . reasonable to insist on some objective measure of claimants' capacity to work, so long as that measure is appropriate as applied to each specific condition.").

fibromyalgia.[136] The relevant question when reviewing Sedgwick's decision to deny benefits is not whether Tortora actually suffered from any particular illness, but whether that illness rendered her "Totally Disabled" within the meaning of the Plan.[137] While Tortora may not have been able to produce objective evidence regarding her symptoms – and the Court does not question that she was indeed suffering from significant physical pain and psychological distress – it was not unreasonable for Sedgwick to require objective evidence suggesting that she was unable to return to work.

### 4.    Consideration of All Medical Evidence

Tortora claims that Sedgwick ignored the reports of her treating physicians tending to support her claim for disability, as well as her own subjective complaints of pain and stress on the job.  I have already concluded that Sedgwick was not obligated to consider Tortora's subjective complaints, in the absence of objective evidence of disability.  Sedgwick's decision to dismiss Tortora's claim was not based solely on the lack of objective medical evidence.  On the contrary, Sedgwick relied heavily on the findings of the reviewing NMR physician advisors, and indeed on the reports of Tortora's own treating physicians, some of whom

---

[136]    *See Hobson*, 574 F.3d at 88.

[137]    *See Fitzpatrick,* 2008 WL 169318, at *11.

35

indicated that her condition did not preclude returning to work. There is no merit

to the claim that Sedgwick arbitrarily ignored medical evidence that she was

disabled. It was completely within Sedgwick's discretion to determine that the

evidence in the record was insufficient to support a claim for disability,[138] and this

Court cannot substitute its judgment for that of the Plan Administrator.[139] Because

Tortora did not meet her "burden of proving, by a preponderance of the evidence,

that she is 'totally disabled' within the meaning of the Plan,"[140] I conclude that

Sedgwick's decision to terminate benefits was not arbitrary and capricious.

### D.    Breach of Fiduciary Duty

Plan administrators have a fiduciary obligation to act solely in the

interest of plan participants.[141] Tortora claims that Sedgwick breached its fiduciary

duty by dismissing claims unreasonably and without substantial evidence in an

---

[138]    *See Hobson*, 574 F.3d at 88 ("By the terms of the Plan, [the administrator] retains the discretion to interpret what constitutes 'sufficient medical evidence,' and [the administrator's] determination that such evidence requires objective support, rather than merely subjective reports of pain, is reasonable.").

[139]    *See Pagan*, 52 F.3d at 442.

[140]    *Fitzpatrick*, 2008 WL 169318, at *9 (quoting *Paese v. Hartford Life Accident Ins. Co.*, 449 F.3d 435, 441 (2d Cir. 2006)). *Accord Lee*, 2007 WL 1541009, at *4 ("[The administrator] is not required to disprove the possibility that [plaintiff] was disabled in order to terminate her benefits; rather, it is [plaintiff's] burden to demonstrate her disability under the Plan.").

[141]    *See Devlin*, 274 F.3d at 89 (citing 29 U.S.C. § 1104(a)(1)).

effort to decrease costs for AT&T.  In other words, Tortora suggests that Sedgwick administered the Plan in AT&T's financial interest, rather than in the interest of beneficiaries.

Tortora is correct in pointing out that "ERISA imposes higher-than-marketplace quality standards on insurers."[142]  ERISA places "a special standard of care upon a plan administrator" by requiring "that the administrator 'discharge [its] duties' in respect to discretionary claims processing 'solely in the interests of the participants and beneficiaries' of the plan."[143]  The statute "simultaneously underscores the particular importance of accurate claims processing by insisting that administrators 'provide a full and fair review of claim denials,'"[144] and "supplements marketplace and regulatory controls with judicial review of individual claim denials."[145]

However, I can find no evidence in the administrative record to suggest that Sedgwick failed to live up to the ERISA standard.[146]  Sedgwick

---

[142]    *Glenn*, 128 S. Ct. at 2350.

[143]    *Id.* (quoting 29 U.S.C. § 1104(a)(1)).

[144]    *Id.* (quoting *Firestone*, 489 U.S. at 113).

[145]    *Id.* (citing 29 U.S.C. § 1132(a)(1)(B)).

[146]    To the extent Tortora is claiming that Sedgwick was biased by its financial relationship with AT&T, I have already addressed that argument above.

considered the medical evidence proffered by Tortora, requested updated reports from her doctors as needed, and continued to grant her STD benefits, even when she missed submission deadlines.  Moreover, Sedgwick sought independent medical advice from physician advisors in all the relevant specialities.  As Claims Administrator, Sedgwick had to decide among conflicting medical opinions.  Because there is no evidence it did so unfairly or unreasonably, Tortora's claim for breach of fiduciary duty fails.

## V.   CONCLUSION

For the foregoing reasons, Plaintiff's cross-motion for summary judgment is denied and Defendants' motion for summary judgment is granted.  The Clerk of the Court is directed to close these motions (Docket Nos. 18 and 25) and this case.

38

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            July 30, 2010

## - Appearances -

**For Plaintiff:**

Jon Charles Lyons, Esq.
Law Office of Jon C. Lyons
53 North Duke Street, Suite 205
Lancaster, PA 17602
(717) 393-3647

**For Defendants:**

Kristine Jayne Feher, Esq.
Joshua Andrew Polak, Esq.
Elizabeth J. Sher, Esq.
Day Pitney, LLP
200 Campus Drive
P.O. Box 1945
Morristown, NJ 07962
(973) 966-8198